Robert A. Helton, Administrator of Estate of Walter J. Probert, Deceased, Appellee, v. Charles M. Thomson, Trustee of Chicago and Northwestern Railway Company (Substituted Here for Charles P. Megan, Trustee, and Chicago and Northwestern Railway Company, Original Appellants), Appellant.

Gen. No. 40,948.

Heard in the second division of this court for the first district at the October term, 1939. Opinion filed July 1, 1941. Rehearing denied September 17, 1941.

Nelson J. Wilcox and I. C. Belden, both of Chicago, for appellant.

H. A. Barnhardt, of Chicago, for appellee.

Mr. Presiding Justice Friend delivered the opinion of the court.

Robert A. Helton, administrator of the estate of Walter J. Probert, deceased, brought suit under the Federal Employers' Liability Act to recover damages for the death of his intestate. The jury returned a verdict in favor of plaintiff assessing his damages at $13,500. Defendant appeals from the judgment entered on the verdict.

There is substantially no dispute as to the salient facts. Defendant operates a railroad with two double track main lines between Chicago and Milwaukee. On the night of February 3, 1938, its freight train, consisting of an engine, cars and a caboose, proceeded south on the southbound main line track from Milwaukee, Wisconsin, to Waukegan, Illinois, where pursuant to some switching operations the conductor and rear brakeman discovered that there was a leak in the air brake pipe underneath the eighth car ahead of the caboose, which was also the 34th car back of the engine. It was decided to take that car out of the train and leave it at Waukegan, a car repair point along the right of way. The operation normally required to set this car out for repairs necessitated the uncoupling of the automatic couplers at the rear end of that car, closing the air line pipe at both ends of the car by turning the shutoff or angle cocks, closing the air line pipe at the rear end of the car ahead, and "bleeding" the air out of the air line and the auxiliary air tanks on the eighth car itself. Following these various steps the engine would then haul the forward 34 cars, including the defective one, to an appropriate switch track, where the bad car would be set out and

left and the remainder of the then 33 forward cars would be backed against and coupled onto the rear 7 cars and caboose, permitting the train to proceed on its way south to Chicago, which was its final destination. The various steps necessary to setting out the defective car had been completed to the point of shutting off the air line and bleeding the car, but then upon information from decedent to the crew, the engine, with the 34 cars next behind it, including the "bad order car" at the end of the string, pulled out south, leaving the other seven cars and the caboose, as well as the conductor and the rear brakeman, at Waukegan. Walter J. Probert, plaintiff's intestate, the head brakeman on the train, was at the front of the train, off and on the engine, while the various necessary steps heretofore described were followed, and it was he who was responsible for the movement out of Waukegan, leaving part of the train and crew behind. As the result of this situation, the yard clerk at Waukegan, near whose office the incident had taken place, telephoned to the chief dispatcher at Chicago reporting the circumstances, and as the engine and 34 cars were proceeding south, the train was intercepted by the towerman at Lake Bluff, the next interlocking plant and tower, some 5 or 6 miles south of Waukegan, and ordered to stop. The chief train dispatcher at Chicago, who had received a telephone call from the yard clerk at Waukegan, dictated a message to the towerman at Lake Bluff with directions that it be delivered to the engineer in charge of the train as it passed through Lake Bluff. The message read: "Chicago, Illinois, February 3, 1938. To Engineer: You left your rear part of train at Waukegan. Set out part of train you now have on east passing track at Lake Bluff and return at Waukegan on westward track for balance of your train. OAG." Ira M. Arquilla, towerman at Lake Bluff, stopped the engine at his tower as directed and delivered the original message

to Probert, the deceased. Probert thereupon read it aloud to the enginemen, then handed it to the engineer, Albert Olsen, who read it aloud to the fireman, Henry Christiansen, and Probert. The engineer and Probert, in the presence of the fireman, then discussed the movements necessary to carry out the instructions of the chief dispatcher, and came to an understanding, which the engineer, who was in charge of the train in the absence of the conductor, formulated and which was as follows: The train was to proceed on in a southerly direction; Probert was to get off the engine at the pot, or dwarf, signal, at the south end· of the interlocking plant, stay there until the rear car cleared that signal, and then with his lighted fusee (a bright red signal light), signal to the enginemen to stop. He was then to await the indication on the pot, or dwarf, signal, alternately operated as a part of the interlocking plant, that the train might be backed into and on the plant and into the east passing track and then signal the enginemen to so back up. This was described by several witnesses as the appropriate and only operation necessary to carry out the order of the train dispatcher.

The layout of the tracks at Lake Bluff is shown by a blueprint introduced in evidence. The main line between Chicago and Milwaukee runs directly north and south, and not far west of Lake Michigan. Although defendant operates two double track main lines between these points, the more easterly of the·two is the only one involved in this proceeding. In railroad parlance the more easterly track of this line is called the east track, which takes care of the southbound traffic from Milwaukee to Chicago. The so-called west track accommodates the traffic north from Chicago into Milwaukee. Except in emergency or other unusual circumstances, no northbound trains are operated on the easterly or southbound track. In double track territory the Northwestern operates its trains on the left-

hand tracks, but the engineer is stationed on the right-hand side of the engine, as on other railroads, and the fireman on the left-hand side thereof. Owing to a slight curve in the track, and obstructions near the track south of the tower and the pot signal, and the location of the latter on the east or fireman side of the train, Probert's signals had to be and were received by the fireman and orally transmitted to the engineer, who could not see Probert from the right side of the engine.

About 400 feet south of the south end of the interlocking plant and the pot signal there is at Lake Bluff leading at an acute angle north from its switch, a short siding, built to accommodate some ten or twelve cars, called the house track, the switch of which, connecting it with the easterly or southbound main track, is operated by hand. It has no switch light on it for night switching, and is not a part of and is incapable of being operated by the interlocking plant. This house track was built to serve the freight house built adjacent to it and was used for "spotting" merchandise cars there, usually one at a time, for loading or unloading at the freight house.

The so-called east passing track onto which the chief dispatcher ordered the engineer and Probert to put the 34 cars is a long track accommodating some 40 or 50 cars. It is connected with the easterly or southbound main track only at its south end, being in fact a stub track which was seldom used as a passing track, even though it was so-called, but was commonly used as a convenience by a station to station train or switch run to temporarily store a portion of its cars while working at other stations and then returning to take them up. This passing track was also used, as indicated by the evidence, for setting out bad order cars until the repair man could come and repair them, and for holding "bunk" cars, where trainmen live, eat and sleep while at work in that neighborhood.

After the message was received and read aloud to the enginemen, then handed to the engineer who read it aloud to the fireman and Probert, the crew proceeded to carry out the switching operation under the direction of the engineer, in pursuance of the instructions received and the plan agreed upon. The engine and cars proceeded south and Probert got off the engine at the pot signal. The accident occurred about 4:00 o'clock in the morning, and owing to the darkness, the weather conditions and the circumstances involved, signals had to be and were given by lighted fusees, which were in Probert's possession. The 34 cars and engine constituted a rather lengthy train, so that the fireman and engineer were nearly one third of a mile from where Probert was stationed. Probert alighted from the engine on which he was riding at the signal as planned and he then undoubtedly knew that there were no cars on the east passing track and that the track was clear. The first signal from Probert's fusee, after he alighted from the engine, was the car stop signal, which was given from either the side or top of a car at the end of the train. The fireman at once transmitted this signal to the engineer, who then brought the train to a stop. From the top of a car Probert next gave the car back-up signal, which the fireman again relayed to the engineer, who then acted upon it and started the train in a backward motion. The next was a slow signal, indicating desired retardation of speed, which was at once followed by the engineer by applying his independent brake, which acts upon the engine alone and has the effect of slowing the engine and the whole train. Probert, by means of his fusee, which was of course not visible to the engineer from the right side of his cab, kept repeating the slow signal, and the engineer obeyed this by keepin his speed reduced accordingly. The next fusee signal given was a stop signal, then a fast stop signal, and finally an emergency signal (what they call a

''washout,'' which means stop at once). This signal was immediately relayed by the fireman to the engineer who applied the full emergency braking power, the emergency air brakes, and almost immediately after that, the enginemen testified, they felt a shock or jar from the rear end, and the train came to a stop within a distance of approximately 75 feet. Immediately after the emergency brakes were applied Probert's fusee disappeared. He had been standing on the top of the rear car, and when the fireman observed the disappearance of the fusee he descended from the engine, walked to the rear end of the train, and then discovered for the first time that the rear cars of the train were on the little house track instead of on the east passing track, as the train dispatcher had directed and as the crew had planned. The rear car was tipped off the dirt embankment, which constituted a part of a bumper that had been provided at the end of the little house track, and Probert was found lying dead on the ground. The engineer waited awhile and then he too went back and learned for the first time that Probert had thrown the hand switch and directed the train into the house track instead of into the east passing track. It is clear from the evidence that at no time before the derailment did Probert, the engineer or the fireman mention the house track or in anywise indicate that the cars should be put anywhere but on the east passing track, as ordered by the train dispatcher and the engineer in the conference of the crew upon receipt of the dispatch from Chicago.

The evidence affords no explanation why Probert, of his own accord, and without advising the engineer or the train dispatcher, went from the pot signal to the house track switch, unlocked it, lined it up by hand, and then by signal backed this train into the house track. Nevertheless, that is what he did. The administrator, a brother-in-law of the decedent, was engaged as a train dispatcher for the Chicago, Milwaukee & St.

Paul Railroad, and he offered several theories as to possible reasons why Probert had directed the train onto the house track in violation of the train dispatcher's orders, but none of these theories is supported by such evidence as would justify his violation of the dispatcher's orders. Numerous witnesses, including plaintiff himself, testified that train dispatchers' orders must be implicitly obeyed, and if an order is ambiguous or impossible of performance, or if after its receipt the trainmen discover a condition which would make it dangerous to carry it out, it then becomes their duty to telephone to the dispatcher, if a telephone is available, and ask for further or different instructions. In this instance a telephone was available in the tower man's station at Lake Bluff.

From evidence adduced by Philip G. Campbell, defendant's division superintendent, and Daniel O. Bubb, the station agent at Lake Bluff, it appears that the east passing track was rarely used as a passing track. It was used mostly for storage track purposes, and there is no evidence to the contrary. Likewise, the house track had its own definitely limited uses. It was not connected up with the interlocking plant, and access to it was by means of a hand thrown switch, on the switch stand of which there was no signal light for night switching. Cars placed on this track were usually spotted there at the freight house for loading or unloading purposes, and the evidence discloses that at least for ten years before this accident no cars on this track had rolled much beyond the freight house, and none as far as the improvised bumper at the dead end of this track. Since this house track accommodated only ten or twelve cars, Probert, who had been engaged as a brakeman on the road for some 16 years and was familiar with the track layout, must have known that it was dangerous to back a 34-car freight train thereon. On the other hand, it was not at all dangerous to back a train of this length into the east

362

passing track, and the crew had been specifically ordered by the train dispatcher to use the east passing track in this switching operation. Under the circumstances, the only conclusion deducible from the evidence is that Probert, for reasons known only to himself, and without advising the engineer or fireman who were proceeding to place the cars on the east passing track in accordance with the dispatcher's orders, directed the fireman and engineer to back the train onto a short and dangerous switch track in violation of specific instruction and an ironclad rule of the company that train dispatchers' orders must be implicitly followed.

The administrator and his counsel argue that the fireman and engineer were negligent in not slowing the train down more when Probert gave the slow signal by means of the lighted fusee, and in not stopping the train immediately when the "washout" or emergency signal was given immediately preceding the accident. While there may be some dispute as to the facts on this phase of the case decisions under the Federal Employers' Liability Act, which are controlling in cases of this kind, are consistently to the effect that if the sole proximate cause of plaintiff's injury or death resulted from his own conduct, it bars recovery. In *Great Northern Ry. Co. v. Wiles*, 240 U. S. 444, a drawbar on a freight train came apart, and the train, while stopped, was hit by a following passenger train. Wiles was the rear brakeman on the freight train, and it was his duty when it stopped to go back and flag, which he failed to do, staying in the caboose where he was killed by the collision. The court denied recovery, saying: "There is no justification for a comparison of negligences or the apportioning of their effect. . . . Wiles knew them (the rules) and he was prompted to the performance of the duty they enjoined . . . by signals. . . . He disregarded both. . . . He brought death to himself and to the conductor of his

train." In *Davis v. Kennedy,* 266 U. S. 147, an engineer was killed in a collision of his train with another, west of a point known as Shops. The other train had the right of way, and the crew of Kennedy's train had instructions never to pass Shops unless they knew as a fact that the other train had passed it. Kennedy ran his train past and beyond Shops and the collision occurred. Negligence of the other members of the crew was alleged but recovery was denied, and Mr. Justice HOLMES, in commenting on the circumstances, said (pp. 148, 149): "It seems to us a perversion of the statute (the Employers' Liability Act) to allow his representative to recover for an injury directly due to his failure to act as required on the ground that possibly it might have been prevented if those in secondary relation to the movement had done more." In *Unadilla Valley Ry. Co. v. Caldine,* 278 U. S. 139, a conductor who had printed orders that his train was to pass the other at Bridgeport, instead of waiting at Bridgeport, directed his train to proceed, resulting in a collision in which Caldine, the conductor, was killed. Certain facts showing unusual conduct on the part of other employees were adduced in evidence, but the court reversed judgment for plaintiff, saying (p. 142): "He cannot hold the company liable for a disaster that followed disobedience of a rule intended to prevent it, when the disobedience was brought about and intended to be brought about by his own acts.'

It is clear from the record that Probert's negligence was the primary and in fact the sole and efficient cause of his death, and under the consistent rulings of the Federal courts, many of which are cited in defendant's brief, recovery is barred under the act. (*Atlantic Coast Line R. Co. v. Davis,* 279 U. S. 34; *Southern Ry. Co. v. Gray,* 241 U. S. 333; *Southern Ry. Co. v. Youngblood,* 286 U. S. 313; *Frese v. Chicago B. & Q. R. Co.,* 263 U. S. 1, 3.)

We have searched in vain for any evidence tending to show that the negligence of defendant or any of its employees was the proximate cause of the death of plaintiff's intestate. The complaint alleges that defendant negligently failed to provide a safe and secure stop at the north end of the house track; that it negligently maintained there a pile of dirt that would cause a car which should run off the end of the track to tip over; and that it so negligently operated the train as to cause it to run violently off the track and onto said embankment. All these allegations are effectively answered by the circumstances that this train should not have been on the house track, that it was placed there by Probert without the knowledge of the engineer and fireman, and in violation of the dispatcher's orders, and that Probert's own conduct in disobeying the train dispatcher's orders and violating the directions of the engineer in charge of the train, was the proximate cause of his death.

Plaintiff's counsel argue that where there is negligence both of the injured party and some other employee of defendant which combined to cause the injury, contributory negligence of the injured party is no defense. This rule is not applicable under the undisputed record in this case that Probert violated the company's orders, and that in so doing he created a dangerous situation for which he was solely responsible and for which there is no plausible explanation in the record.

Plaintiff argues that where a motion for a new trial, although filed in writing, is not argued by the moving party, the judgment should be affirmed. His counsel take the position that it is the right of every litigant, in so far as possible, to dispose of his case in the *nisi prius* courts, and that a mere perfunctory motion is not such a presentation thereof as will entitle the moving party to the judgment of an Appellate Court upon

the question of whether the trial court did or did not err in overruling the motion for a new trial. The record discloses that defendant's motion to set aside the verdict of the jury and for a new trial specifies 22 different supporting reasons for the motion which was made April 21, 1939. Subsequently, April 27, 1939, the court entered an order reciting that defendant by its counsel together with attorney for plaintiff appeared in court; that defendant's attorney announced to the court that he had filed a motion for a new trial, "but he wished to submit it to the court without oral argument, and did then and there submit said motion to the court without oral argument, and the said court then and there denied the same." The gravamen of plaintiff's contention is that defendant's counsel, having failed to argue the motion, this court is precluded from reviewing the evidence, considering its weight, or the rulings of the court on its admission or exclusion, and that the judgment should therefore be affirmed. Plaintiff relies on several decisions, including *Calumet Furniture Co. v. Reinhold,* 51 Ill. App. 323, and *Firemen's Ins. Co. v. Horton,* 68 Ill. App. 497. Both of these cases were considered in the more recent decision of *Eckels v. Hawkinson,* 138 Ill. App. 627. In that case the trial court certified that defendants being invited and called upon by it to argue the motion for new trial refused to do so, and refused to point out to him in more particularity than did the formal written motion before him, what they relied on to show the verdict erroneous, or the rulings of the court on the admission of evidence, mistaken. Upon that state of the record the question arose whether the conduct on the part of defendants amounted to a waiver of the motion for a new trial, and it was held that it must be considered as having been abandoned. In reviewing prior decisions in this State the court pointed out, however, that the earlier view, as

expressed in *Calumet Furniture v. Reinhold,* and in *Firemen's Ins. Co. v. Horton,* had later been modified by a less rigorous rule, and said (pp. 631, 632) : "Thus, in *Hartford Fire Ins. Co. v. The Northern Trust Co.,* 127 Ill. App. 355, the doctrine of *Calumet Furniture Co. v. Reinhold, supra,* is by this court expressly repudiated, if it is to be understood as tantamount to a general rule that every motion for a new trial which is not argued is to be considered abandoned. Similar dissent from this extreme view has been expressed by the learned justices of the Appellate Court in the Second and Fourth Districts, respectively, in *Modern Woodmen of America v. Graber,* 128 Ill. App. 585, and in *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Sparks,* 122 Ill. App. 400." The current rule undoubtedly is that a motion for a new trial, may be so waived by abandonment in the court below as properly to foreclose the Appellate Court from examining the propositions on which it is based, but each case rests upon the particular circumstances indicating whether or not a waiver may be presumed. The order entered by the trial court in the case at bar shows no such presumption; it rather indicates the contrary. Defendant's counsel called the court's attention to the fact that his motion had been filed, that he wished to submit it to the court without oral argument, and "did then and there submit said motion . . . and the said court then and there denied the same." If the trial judge had desired an oral argument, and so indicated, defendant's counsel would undoubtedly have been called upon to comply with the court's request, or if he had refused to do so the court might have construed the refusal as an abandonment of the motion. (*Eckels v. Hawkinson,* 138 Ill. App. 627; *Hartford Fire Ins. Co. v. Northern Trust Co.,* 127 Ill. App. 355; *City of Chicago v. Sullivan,* 139 Ill. App. 675.)

Although the accident was a deplorable one, we are satisfied, after careful examination of the record, that

the trial court should have directed a verdict in favor of defendant as requested. Because of the failure of the court so to rule, the judgment of the superior court is reversed.

*Judgment reversed.*

SCANLAN and SULLIVAN, JJ., concur.