Harry E. Williams, Appellee, v. New York Central Railroad Company, Appellant.

Gen. No. 44,041.

160

162

Opinion filed June 21, 1948.
Rehearing denied July 6, 1948. Released for publication September 9, 1948.

SIDNEY C. MURRAY, WILLIAM A MORROW, MARVIN A., JERSILD, and LLOYD W. BOWERS, all of Chicago, for appellant.

EDWARD B. HENSLEE, of Chicago, for appellee; WALTER N. MURRAY and MELVIN L. GRIFFITH, both of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Plaintiff brought an action at law under the Federal Employers' Liability Act and Safety Appliance Act to recover damages resulting from injuries sustained by him while employed as a brakeman on one of defendant's freight trains engaged in interstate commerce. Defendant's motions for a directed verdict at the conclusion of plaintiff's case and again at the close of all the evidence were overruled. A motion thereafter made by defendant separately to direct a verdict as to each of the six charges of negligence, was also denied. After the jury had found for plaintiff and assessed his damages at $40,000, the court entered judgment on the verdict. Motions for judgment notwithstanding the verdict and for a new trial having

been made and overruled, defendant has prosecuted this appeal.

The accident occurred on November 23, 1944 about 6:30 a.m. Plaintiff, an experienced brakeman who had been employed by defendant for 31 years with a clear record and promoted successively from machinist helper to handyman, brakeman and conductor, was on the day of the accident a member of the crew of a freight train made up in the freight yard at Bellefontaine, Ohio. There were 13 tracks in the yard, all running north and south. The train here involved was on track No. 5. The yard office was at the north end of that track. Immediately to the north of the yard office, in line with track 5, was a tower 50 feet high, on which were mounted several flood lights focused toward the south to cover the entire yard. When plaintiff arrived at the yard office on the morning of the accident the train had been made up by the crew. The north end of the train was about 15 or 20 car-lengths south of the office, and the caboose at the south end of the train was about 45 or 50 car-lengths from the yard office. When the crew made up the train and left it on track No. 5 several hand brakes had been left on to prevent the train from rolling down the natural slope of the yard before the engine was coupled on, after which it could be held by the air brakes.

Plaintiff's first duty that morning was to walk down beside the train, making a running inspection of the cars and finding the set brakes. He walked down on the west side of the train, made his inspection and released all the brakes except those on the caboose and the five cars immediately to the north thereof. He was required to leave these brakes set until the engine was coupled on and enough air passed through the train to hold it. The car which caused the accident was No. 291872. He testified that he saw nothing about

that car as he walked along the ground beside it to suggest that it was an open-top car. He finally reached the caboose where he performed further duties while the air was coming on. That having been accomplished, he left the caboose to release the brakes. He first released the brake on the caboose and the two cars just ahead of it. The second car was Illinois Central car No. 16483. The brake was on the south end of that car. The next car to the north was defendant's car No. 291872, the so-called open-top box car involved in this case. After releasing the brake on car No. 16483 he walked unhurriedly north along the running board on top of that car. The flood lights nearly half a mile away were in direct line of his movement and threw their light in his face. He held an oil lantern in his hand which under ordinary circumstances would throw a light about 10 feet ahead of him. When he approached the north end of the running board on car No. 16483 he shone his lantern on the end of the next car, No. 291872. The atmosphere was dark and smoky at the time. He testified that the flood lights blinded him; it was like ''looking at an automobile headlight.'' The car looked like any other box car, and defendant said that there were no signs or markings to warn him that the roof and running board had been removed. He stepped, as he had always stepped, across the space between the two cars, usually about one and one-half feet, and instead of stepping on the running board of the car ahead, as he expected to, he stepped off into space, landed on his feet at the bottom of car No. 291872, was thrown to the floor of the car on his neck and shoulders, and injured. He managed to get to the door on the east side of the car, which was open. Handley, the inspector, attracted by his call for help, carried him to the caboose.

Car No. 291872, when delivered to defendant, was a box car with a roof and running board along the top.

The roof and running board were removed by defendant in 1937. Thereafter it was called a roofless or open-top box car. It is first urged that defendant, in using a railroad car from which it had removed the roof and running board without the consent of the Interstate Commerce Commission, violated sections 11–16 of the Safety Appliance Act (45 USCA), and was therefore liable to plaintiff regardless of any negligence on plaintiff's part. The first question therefore presented is whether or not the commission regulation required a car like New York Central No. 291872 to be equipped with a running board. Both sides agree that Congress delegated to the Interstate Commerce Commission the enforcement of the Safety Appliance laws relied upon by plaintiff (45 USCA 15). Lee W. Dobbins, an employee of the New York Central Railroad System for about 30 years, who at the time of the trial was the division general car foreman, testified that he was thoroughly familiar with the rules, regulations, designations and requirements of the commission having to do with the equipment of railroad cars, the use and installation of running boards on freight cars, and particularly so-called open-top or roofless box cars, and that there had never been issued, promulgated or put in force at any time by the commission any rules, regulations, or directives requiring running boards on so-called open-top or roofless box cars. It appears that the commission regulations prescribing safety-appliance standards were set out in the commission's order of March 13, 1911, and are found in Code of Federal Regulations under Title 49, Transportation and Railroads, Section 131.1–131.20, of which it was held in *Lilly v. Grand Trunk Western R. Co.*, 317 U. S. 481, the court will take judicial notice. With respect to freight cars, these regulations require running boards for each "box or other house car," tank car and caboose car (sections 131.1–131.11). They contain no such requirement as to "hopper cars and high-

side gondolas with fixed ends'' (section 131.2), for drop end high side gondola cars (section 131.3), for fixed end low side gondola and low side hopper cars (section 131.4), for drop end low side gondola cars (sec. 131.5), nor for flat cars (131.6), for the obvious reason that none of these cars has a roof. Section 131.18 states that ''cars of construction not covered specifically in the foregoing sections in this part, relative to handholds, sill steps, ladders, hand brakes and running boards may be considered as of special construction, but shall have as nearly as possible, the same complement of handholds, sill steps, ladders, hand brakes and running boards as are required for cars of the nearest approximate type.'' It will be noted that these rules do not prohibit the removal of roofs from box cars and their adaptation to other purposes; in fact the rule indicates that the commission contemplates types of cars not described therein. The fact that it described ''high side gondolas with fixed ends'' as ''cars with sides more than 36 inches above the floor'' (131.2) indicates that there is authority for the construction and use of a car like NYC 291872; and since the car in question was neither a tank car nor a caboose car, a running board is not required unless it is a ''box or other house car.'' Defendant cites various dictionary definitions to indicate that a house car is a box car (Webster's New International Dictionary, 1931), and that a box car is defined as a ''roofed freight car, usually with sliding doors in the sides and sometimes with a small door in one end for loading and unloading long articles.'' In *State v. Green*, 15 Mont. 424, 39 Pac. 322, the court quotes the Century Dictionary definition of a box car as '' 'an inclosed and covered freight car.' '' See also Encyclopedia Britannica, 14th Ed., Vol. 3, p. 985, and Funk & Wagnall's New Standard Dictionary, 1937, for definitions of a box car as being ''a roofed freight car with enclosed sides.''

The only case called to our attention which considered this question is *Goulette's Adm'r v. Grand Trunk Ry. Co.*, 93 Vt. 266, 107 Atl. 118, wherein a directed verdict for defendant was affirmed. It was there contended by plaintiff's intestate that decedent fell from a car without a running board. That car, No. 1765, as shown by the opinion, "was a flat bottom car which had been converted into a rack car by the erection of 12 stakes 9 feet high on either side and of 5 at each end, of the same height. . . . They were attached on the sides to sockets in the car beam. . . . The car was equipped with end and side ladders on the outside. . . . There was no running board over the top of car 1765 and no boarding thereon. Cross-timbers were attached to the ends of the stakes at the top extending from side to side of the car. The sides and ends of the car were boarded up with narrow boards with spaces between. The boards were attached to the stakes on the inside." It thus appears that in all important respects that car was like the car here under consideration, except that it was constructed by the process of building sides and ends on a flat car, whereas NYC 291872 resulted from the removal of the roof and reconstruction of a box car. In referring to the Federal statute here under consideration, the court said: "On March 13, 1911, the Interstate Commerce Commission, acting under the foregoing statute, promulgated specific and detailed directions as to how each class of cars should be equipped, and, among other things, what cars should be equipped with running boards. Said regulations provide for the equipping of certain kinds of cars with running boards, but they make no provision for rack cars. It is argued by the plaintiff that this question is not properly before the court for the reason that the evidence received during the trial to the effect that car 1765 was properly equipped according to the federal act was inadmissible. It is not necessary to

consider this question, for the reason that the court will take judicial notice of the safety appliance standards of the Interstate Commerce Commission, and these do not show that either running boards or ladder platforms are required on cars like the one in question.''

Under the commission regulations the top ladder tread on open box cars is required to be located ''not less than 12 nor more than 18 inches from roof at eaves'' (sec. 131.1 (e) (2)). ·On high-side gondolas the ''top ladder tread shall be located not more than 4 inches from top of car'' (sec. 131.2 (d) (2)). This ladder regulation covers cars like NYC 291872 and indicates that such a car was not therefore ''a box car with regular construction'' except for the absence of roof and running boards, as charged in plaintiff's complaint. As already indicated, NYC 291872 was reconstructed in 1937. Since that time it had no roof, and it may be assumed from the record that the top treads of the ladder were also applied in the manner required on gondola cars and not permitted on box cars. Within the definition of the commission regulations, the ''nearest approximate'' of NYC 291872 is a ''high-side gondola with fixed ends'' (sec. 131.2) and such a car obviously requires no running board. From these considerations we have concluded that the car in question did not require a running board, and that it was not a violation of the statute to use such a car on defendant's lines. In fact, the evidence discloses without dispute that there were several hundred such cars used by the New York Central as well as by other roads, and that plaintiff was aware of this fact, for he testified that he had occasionally seen open top box cars on the New York Central System Railroad before this accident, knew that they had been in use for many years, and found them on freight trains from time to time.

█ █    In connection with the foregoing contention plaintiff also argues that it was a violation of the commission regulation to reconstruct a box car of this type by removing the roof without a hearing, consent and order of the commission. Section 12 of the Safety Appliance Act is cited as authority for this contention. However, that section merely requires that a hearing be had and good cause shown before rules as to standards of equipment will be changed by the commission. The section cited does not prohibit the conversion of a car from one type to another without a hearing and good cause shown. The commission regulation merely sets out specifications for the various types of cars. Obviously Congress and the commission were primarily concerned about the proper safety appliance requirements for any particular type of equipment, and under the commission regulations, changes from one type to another are not prohibited so long as the car has the safety appliances required of its particular type.

█    Aside from the foregoing contention, plaintiff charged several specific acts of negligence. It is first urged that defendant failed to furnish him with a safe place to work because it used a box car without a roof or running board "when the condition of the car could not be seen in the darkness." Since such a car obviously requires no roof or running board (sec. 131.2), the car in question complied with the standards prescribed by law, and plaintiff is not in a position to base any negligence on its use. It is a matter of common knowledge that freight trains are frequently made up at night, and the fact that the construction of the cars could not be seen in the dark, if such construction complied with the required standards, would not of itself constitute negligence. In *Ellis v. Union Pac. R. Co.*, 329 U. S. 649, the court said that "The Act [Federal Employers' Liability Act] does not make the em-

ployer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And that negligence must be 'in whole or in part' the cause of the injury.'' In *Auschwitz v. Wabash Ry. Co.*, 346 Ill. 190, the court, invoking the decisions of the Federal court, held that where the Interstate Commerce Commission has by order prescribed rules and specifications of this character, ''all that is required of the carrier to fulfill its duty in that respect is a strict compliance therewith. These principles are announced as the conclusions of the court, after a careful consideration of them, in the case of *Baltimore and Ohio Railroad Co. v. Groeger*, 266 U. S. 251.'' We find no authority holding that the mere use of cars such as NYC 291872 constitutes negligence. Hopper cars, gondola cars, flat cars and tank cars have no roofs or running boards permitting direct passage from the top of one car to that of another. Such cars constitute a large proportion of the freight trains used in this country, and obviously the danger of injury is as great in connection with those types as with NYC 291872, because if one continues to walk toward them from adjoining box cars without looking to see what lies ahead, an accident such as the one here involved could easily occur.

█ It is next charged in the complaint and urged that defendant was negligent in removing the roof of a car and using it along its lines, knowing that men in passing over the car in darkness could not see that the car was without a roof or running board and that its use would be dangerous or hazardous. Inasmuch as the removal of the roof and the use of the car without a roof or running board is not violative of the commission regulations, as we have concluded, the jury in the case at bar could not properly find defendant guilty of this charge. The evidence discloses that the place where plaintiff was working was lighted with flood lights, and he testified that he carried a lantern, which

he had previously cleaned, for the purpose of guiding him in his duties. That lantern lighted up his path at least 10 feet ahead; therefore, whatever might be the rule as to one passing over a car like NYC 291872 in the darkness is not applicable because plaintiff was not required to pass over it in darkness, and as a matter of fact he did not attempt to do so. Plaintiff does not cite any cases holding that a railroad may not operate cars whose tops or absence of roofs could not be seen in darkness. If that were the law a carrier would be negligent when it uses hopper cars, tank cars or gondola cars, and in fact it could also be held liable if all its box cars were not of uniform height. In the case at bar the car next to NYC 291872 was approximately 18 inches higher, and if there had been a roof on NYC 291872 it could equally well be claimed that in the darkness men passing over these cars could not see the disparity in height, which would be just as likely to cause injury to the unwary as would a roofless car, whether such car be a tank car, hopper car, roofless car or so-called open box car. On the theory advanced by plaintiff, all cars would have to be of uniform height and construction. That is clearly not the fact, and all experienced brakemen are aware of it.

The complaint also charges and it is urged that defendant was negligent in not warning plaintiff of the fact that the deck and running board had been removed when defendant knew that "plaintiff could not see that it had been removed, in the darkness." The warning that plaintiff claimed he should have been given, would have had to be verbal, or perhaps written, delivered before he left the yard office, since any warning by stenciling on the car would not have been any more visible or effective in the darkness than the self-evident open top of the car itself. As already indicated, plaintiff knew that open-top cars like NYC 291872 were in general use, that other railroads used them, and that they were occasionally interchanged

from one railroad to another. In *Ward v. Maine Cent. R. Co.,* 132 Me. 88, 166 Atl. 826, the court pertinently observed that "In order to create a duty of warning and instruction, the danger must be one that is known to the employer and unknown to the employee, there being no duty of warning and instruction if it is obvious or if the employee possesses knowledge of the risk to which he is subjected. The rule requiring the employer to instruct his employee and to warn him is only for the purpose of supplying him with information which he is not presumed to have, and if it is shown that the employee did in fact possess the knowledge, the failure to warn can in no sense be said to be the proximate cause of the injury; and if not the proximate cause of the injury, of course it cannot be actionable negligence. The employee is presumed to see and understand all dangers that a prudent and intelligent person of the same age and experience and with the same capacity for estimating their significance would see and understand; and if he neglects to observe the perils of his employment, the fault is his own, not that of the employer." There is considerable force to defendant's argument that if the darkness were such that plaintiff could not detect the absence of a roof when he was standing some 16 inches from the car, on top of another car some 18 inches higher than NYC 291872, he must inevitably have had the same trouble with gondola and hopper cars, and that on his theory of negligence even a previous verbal or written notice that there were gondola cars, tank cars and other roofless cars at a particular place in the yard, would have been insufficient, because the cars were being moved around in the yard from time to time, a common practice known to all employees in freight yards. See also *Friermood v. Oregon-Washington R. & Nav. Co.,* 134 Wash. 178, 235 Pac. 17, *Sage v. Wyandotte Terminal R. Co.,* 193 Mich. 194, 159 N. W. 139, and *Kenney v. Boston & Maine R. R.,* 92 N. H. 495, 33

Atl. 2d 557, wherein the claimed failure of warning to experienced employees who were presumed to be familiar with the type of equipment in use is fully discussed.

The concluding charge of the complaint is that "defendant was careless and negligent in not using ordinary care to reasonably light its premises and cars so that plaintiff could see that the deck and running board had been removed from one of its box cars." It is suggested by defendant that railroads are not required to keep their yards lighted or to cease operations when it is dark. .It is undisputed in the case at bar that flood lights were focused on the tracks so as to cover the entire yard. Moreover, plaintiff had a lantern which was in good working order, which he testified would throw a light "probably ten feet ahead of you or a little better." The car which produced this accident was less than two feet away, and plaintiff was unhurried in the performance of his duty. It is therefore obvious that the accident was not caused by the absence of light, but rather by plaintiff's failure to look or to heed what he saw.

Defendant alleged in its answer and contended upon the trial that the injuries sustained by plaintiff were the sole proximate result of his own negligence, and this averment was not denied by plaintiff. Under the settled rules applicable to claims brought under the Federal Employers' Liability Act, contributory negligence as such is not a complete defense, but if the sole proximate cause of the injury or death results from the injured person's own conduct, it bars recovery. *Helton v. Thomson*, 311 Ill. App. 354. In the case at bar plaintiff was the only witness as to the occurrence of the accident. We have examined the record carefully and are impelled to reach the conclusion that his injuries resulted solely from his carelessly stepping into space. The unknown danger which he charges, resulted only from his failure to observe that

which manifestly was visible, even upon the most casual inspection, or because he did look but failed to heed what he saw. He undoubtedly knew that his stepping out from the car he was on would be dangerous if the next car were a tank car, flat car, gondola car or any other type of roofless car, because he had known that these various types of equipment had been in use for many years. He was familiar with the fact that even box cars are not of uniform height, and that the distance between them is not always the same, and he must have been aware of the fact that in order to be safe he would have to ascertain where he was going to step; nevertheless he proceeded forward without securing or heeding that information. Although his complaint proceeds on the theory that he was working in darkness, he nevertheless testified that the yard was flood lighted. Nor would his testimony that the flood lights blinded his vision help him because if he could not see what was ahead, he was clearly negligent in stepping out into the unknown from a place 10 to 12 feet above the ground. The instant contention also loses its force when considered in the light of the fact that in his attempt to see where the brake was on the car in question he looked, not upwards toward the flood lighted tower, but directly down, since he was standing about 6 inches from the end of the car he was on, and the top of the roofless car was 12 to 18 inches lower than his car and was only about 16 inches away. Undoubtedly he was able to observe the distance from the roofless car to the car on which he stood. Plaintiff's only explanation as to why he did not also see that the car was roofless is that it "was below me." Presumably that fact should have made it all the more evident that the car was roofless, especially if, as he said, the flood light was shining down from a 50-foot tower and his lantern would throw a good light 10 feet or better ahead of him. It seems inconceivable that with these lights he would have failed to detect the ab-

sence of a running board if he had looked. Under the Federal regulations, running boards on box cars are required to extend over the ends of the cars to a point not less than 6 nor more than 10 inches from a vertical plane parallel with the end of the car (regulation 131.1 (c) (4)). Plaintiff testified that when he looked down at NYC 291872 he observed that the ''roof was curved the same as any other roof.'' In making this observation he could not have escaped noticing that the car had no running board.

There is another consideration that enters into the circumstances under discussion. Instead of having the hand holds on the roof of the car, as is required for box cars by the commission regulation (131.1 (g) (3)), these hand holds had been built on NYC 291872 to comply with the regulations, and an experienced brakeman, such as plaintiff was, must have known when he saw that NYC 291872 had top ladder treads or hand holds about 4 inches from the top of the car that it was one of the types of roofless cars then in use.

Plaintiff testified that he could see from the car on which he was standing that the roof of NYC 291872 ''was not straight across.'' If he made that observation he could not have helped observing that the running board upon which he thought he was about to step, was not there. In any event, it was his duty to ascertain by any means at hand what was ahead, before attempting to step onto the next car. In *Baltimore & Ohio R. Co. v. Berry*, 286 U. S. 272, where judgment against the defendant was reversed, it appeared that a freight train had stopped at night to await the throwing of a switch, and the caboose, occupied by the conductor and rear brakeman, was resting on a trestle. The conductor ordered the brakeman to get out and proceed ahead to fix a hot box in a forward car. Taking his lantern, the brakeman stepped out, fell into a ravine, and was injured. The court held that the request of the conductor to the brakeman

was not a command to alight regardless of any danger reasonably discoverable by him, ''or to omit the precautions which a reasonable man would take to ascertain, by inspection, whether he could safely alight at the point chosen. There was no evidence that the respondent could not have discovered the danger by use of his lantern or by other reasonable precautions, or that he in fact made any effort to ascertain whether the place was one where he could safely alight.'' Under the circumstances of that case the court held that if negligence caused the injury, it was exclusively that of plaintiff.

In the view we take the trial court should have directed a verdict for defendant as to the charge that it violated the Safety Appliance Act, since defendant could not be liable on that charge. After defendant's general motion for a directed verdict had been denied, it moved the court to direct a verdict separately as to each of the several charges of negligence heretofore discussed. The court denied that motion.

After a careful examination we have reached the conclusion that plaintiff was guilty of negligence as a matter of law, and that such negligence was the sole proximate cause of his injuries. Under the circumstances the court should have directed a verdict for defendant, and because of its failure so to do, the judgment of the superior court is reversed without remandment.

*Judgment reversed without remandment.*

SCANLAN and SULLIVAN, JJ., concur.